[No. 36842.    Department  Two.    October 29, 1964.]

THE STATE OF WASHINGTON, *Respondent*, v. GERALD LEE
MATLOCK, *Appellant,* DONALD R. MCKENZIE, *Defendant.**

*B. E. Kohls* and *Hancock & Kohls,* for appellant.

*R. E. Young,* for respondent.

*Reported in 396 P. (2d) 164.

HAMILTON, J.—Defendant (appellant) Gerald Lee Matlock stands convicted of second-degree assault and attempted robbery.

By information, dated August 23, 1962, defendant and Donald R. McKenzie were charged with (1) second-degree assault for "wilfully and unlawfully striking, beating, hitting and kicking" one George San Pierre, the complaining witness, and (2) robbery for the taking of money, by force and violence, from the same party. By a separate information one George Kindler was charged with second-degree assault arising out of the same transaction. The prosecutions of the respective defendants were conducted separately, Gerald Lee Matlock's case being heard by the court sitting with a jury.

Prior to submission of his case to the jury, defendant moved for a directed verdict of acquittal on the robbery charge. The motion was denied. After the return of the verdicts of guilty, defendant moved for judgment notwithstanding the verdict or in the alternative for new trial as to both charges. This motion was likewise denied, and this appeal followed.

On August 21, 1962, George San Pierre, a 56-year-old farm laborer from Oroville, with upwards of $70 in his pocket, went to Omak and Okanogan for entertainment, which, from the record, appeared to consist mainly of consuming alcoholic beverages. After a full day of entertainment, he arrived at Matlock's Drive-In, located between Omak and Okanogan and owned by defendant's father. Being afoot, he requested a ride into Omak. Mr. Matlock, Sr., arranged for a ride in an automobile being driven by Donald R. McKenzie. George Kindler and the defendant, acquaintances of Donald McKenzie, were passengers in the McKenzie vehicle when the ride for San Pierre was arranged and undertaken. San Pierre testified that sometime before his arrival at the drive-in he had checked his resources and found he had about $48 remaining in his wallet. The accuracy of his recollection and count was substantially challenged on cross-examination.

Instead of going to Omak, Donald McKenzie drove to an isolated spot in the country. There is a conflict in the evidence as to the reason for this detour, that is, whether it was occasioned by belligerence on the part of San Pierre or design on the part of McKenzie and one or more of his companions. In any event, San Pierre was ordered out of, or forcibly removed from, the vehicle, beaten about the face and body, and left in a semiconscious or unconscious state.

There is dispute in the testimony as to who assaulted San Pierre and whether a robbery was undertaken. San Pierre's testimony in this regard constitutes the basis of an assignment of error on this appeal. McKenzie testified he and the defendant assaulted San Pierre. George Kindler asserted McKenzie and the defendant administered the beating, and that he saw the defendant remove San Pierre's wallet from his prone form. Both McKenzie and Kindler testified that, in response to subsequent inquiry, the defendant informed them that San Pierre had no money. The defendant denied any participation in the assault and maintained McKenzie, encouraged by Kindler, inflicted the punishment. He further testified that he attempted to stop the fray, during the course of which effort San Pierre voluntarily handed him his wallet, which he immediately returned without examination.

San Pierre made his way to a farm house. The sheriff's office was notified, and he was taken by the officers responding to the call to Omak, where he identified McKenzie, Kindler, and the defendant, and then to the hospital for treatment of his wounds. At the hospital, San Pierre discovered that his wallet was empty. A search of the defendant, his companions, and the automobile failed to reveal the money purportedly missing.

On appeal, defendant assigns six errors, which, by the manner of presentation, reduce themselves to two major contentions: (a) Error in permitting the prosecuting attorney to impeach the complaining witness, and (b) a challenge to the sufficiency of the evidence in support of the robbery or attempted robbery charge.

The evidentiary setting for the first contention arose in the following manner: San Pierre, as the complaining party, was called as the state's first witness. On direct examination by the prosecuting attorney, he testified, in pertinent part, as follows:

"A. . . . They got out and came around the car and said, 'Get out', and I started to get out and had my head down here (witness illustrates by bending down) and they kicked me and hit me in the nose, and I went down on my face. I jumped right up again and some guy got ahold of me and he started hitting me in the tummy, and I had this arm over my face. I don't know how many times he hit me and I was out. After that I didn't know what happened till I found myself laying in the weeds. . . . Q. Was this Jerry Matlock, the defendant sitting here, one of the boys who beat you up? A. Yes. . . . Q. How many times did you see the defendant, Jerry Matlock, after he beat you up, that evening? A. *I didn't say he beat me up or which one. I got hit by by a tall slim boy.* Q. I asked you if this defendant was one of those boys that beat you up that evening. Was he? A. Yes. . . . Q. Do you know how many times you were struck by this defendant? A. No. Q. Did the defendant use anything other than his fists in beating you? A. I don't know. Q. Do you know whether or not you were kicked? A. I don't know. I was down and I don't know. When I came to I couldn't hardly move. . . . Q. Do you know how many times this defendant, Matlock struck you? A. No. Q. Do you know how long this beating went on? How long were you conscious of what they were doing? A. No. Q. Do you remember how many times you went down and got up? A. I went down once and I got up and I went down again and that was it. Q. That is all you recall or remember? A. Uh huh." (Italics ours.)

In the course of extensive cross-examination, the following testimony was elicited:

"Q. Do you recall talking to me a week or two ago, George? A. Yes. Q. Do you recall me taking a tape recording of a statement from you? A. Yes. Q. Do you recall that? A. Yes. . . . Q. *Do you recall telling me that this heavy-set boy didn't strike you; that it was the two tall, slim boys?* A. You see I didn't know. After I got down I was out. Q. Isn't that what you told me, that it

wasn't this heavy-set boy that struck you; it was the two, tall, slender boys? A. No answer. Q. Isn't that what you told me? A. Well, after I got hit first I just kept covering up— Q. *Will you please answer my question? Isn't that what you told me?* A. *I guess I told you that.* Q. Were you lying to me? A. No. Q. This boy never did strike you, did he? It was those two tall, slender boys, wasn't it? A. Well, one of them hit me first anyway. Q. You never did see this man strike you, did you, George? A. I don't know. It was dark. Q. Did the two tall, slender boys both strike you? A. I don't know. . . . Q. Now, do you recall when you and I had this conversation of me asking you over and over, 'Are you sure that this heavy-set boy didn't strike you?' and do you recall telling me, 'No, he did not hit me'. Do you recall that? A. I was out; I couldn't tell you. Q. Well, prior to you being knocked out? A. I know I was down there twice and then I was down for good. Q. Yes, but this boy didn't strike you the first blow, did he? A. No, the slim guy did. Q. As a matter of fact he never laid a hand on you, did he, as far as you can tell? A. Well, I couldn't see after I first got hit. . . . Q. And when you got up again one of those tall boys hit you again and knocked you down, didn't he? A. I didn't know. I was covered up. I had my hands over my face and I couldn't see. Q. Don't you recall this boy finally pulling those two off of you? A. No. . . . Q. And as far as you know, this boy could have pulled those other two off of you, couldn't he? A. (Witness nods). . . . Q. *Do you recall telling me, up in my office, that you were sure this boy never struck you?* A. *I did, but you know, I was hit by a tall guy and I didn't know who finished me.* . . . Q. Were you lying to me in my office, George? A. No. Q. You told me the truth? A. Well, the old man [defendant's father] told me what to tell you. Q. The story you gave me was false, is that right? A. Well, he told me how to go at it, so I told him: 'Well, I don't know what to do.' Q. Well, just answer my question. *Is the story that you gave me in my office false?* A. *Part of it, yes.* Q. *In other words, you lied to me in my office, is that right?* . . . A. *That is right.* Q. Why did you lie to me? A. Well, I was a friend of the old man's. . . . Q. It still boils down to this though, doesn't it, Mr. San Pierre, right now when you are telling us the truth, you don't know whether that boy ever laid a hand on you, do you? A. No, I don't. Q. And you don't know whether anybody took that wallet out of your pocket, do you? A. No. No." (Italics ours.)

On redirect examination the prosecuting attorney brought forth and commenced to read from a written statement taken by an officer when San Pierre was in the hospital recovering from his wounds. The defendant's counsel objected to this procedure and the objection was sustained. In response, the prosecuting attorney stated:

MR. HANCOCK: Certainly I have a right to question this witness about statements that he may have made at a certain time and place, if his testimony is different now than it was then. THE COURT: Are you claiming surprise? MR. HANCOCK: Yes. I talked to this witness, I might tell the court, last Friday and know that what he told was the [sic] as he told me awhile ago. As I understand, his testimony now is slightly different. Therefore, I am entitled to go into his statement. THE COURT: You are not entitled to read from an instrument that is not in evidence. BY MR. JOHN HANCOCK: Q. When did you first talk to me about this case? A. Last Friday. Q. And last Friday was the first time, wasn't it? A. That is right. Q. Did you, at that time, tell me that all three of these boys struck you, or that they held you and two of them beat on you— MR. KOHLS: I am going to object to his leading this witness. THE COURT: Yes. MR. KOHLS: And it is self-serving in any event. It is improper for him to impeach his own witness. . . . THE COURT: Yes. The jury will be excused. . . . MR. JOHN HANCOCK: My position is this: That I talked to this witness last Friday; he made statements to me about what occurred and what happened which are identical to a statement that he gave to the officers on August 22nd, 1962. Now, if he is changing his story, certainly I am taken by surprse, and I am entitled to use that statement and put it in evidence. THE COURT: You are then formally claiming surprise, is that correct? MR. JOHN HANCOCK: Yes, I am."

Following further colloquy between court and counsel, voir dire examination of San Pierre upon the extent of his conversation with the prosecuting attorney, and the return of the jury, the trial court permitted, over defendant's objection, the following:

"BY MR. JOHN HANCOCK: Q. Mr. San Pierre, I asked you whether or not on the 22nd of August, 1962, at about 10:35 a.m., at the hospital in Omak, did you give a statement to

Gerald Beck, the deputy sheriff? A. Do you mean read it over? Q. No. Did you give a statement to Mr. Beck? A. Yes, I did. Q. Did he write that down? A. Yes, he did. Q. And did you sign your name on each page of the statement? A. Yes. . . . Q. Did you make the statement at that same time and place, 'All three of the boys tried to get me out of the car.' A. No, I think I got out of the car myself, but I think I did make the statement there. Q. And— A. (continuing) They asked me out and I got out. Q. And did you make the statement that after they had gotten you out on the ground they all 'beat on me and knocked me down time after time'. Did you tell the officer that? A. I was pretty sick then. I just told him they hit me in the nose here and down here and from then on I couldn't see. Q. Did you make the statement: 'I was about half out'? A. Yes. . . . Q. Did you, at the same time and place, make the statement: 'Two of them would hold me and the other one would hit me in the face and stomach.'? A. Yes. Q. Is that what they did? A. Well, they had me by the arm, I know. I had my other arm this (witness illustrates with his arm to the jury) to cover my face, then I went down. Q. Were two of them holding you while one of them hit you? A. I don't know. . . . Q. Didn't you tell me Friday, and didn't you tell me this afternoon when you were sitting here, when you looked at the three boys, that this defendant, the man sitting at the end of the table here, did strike you? A. I don't remember. I told you the tall, slim kid hit me first and that was it. Q. Your memory has changed considerable since Mr. Matlock offered to pay you some money and to pay your hospital and doctor bills, has it not? [Objection interposed and sustained.]"

We agree with defendant's first contention that the trial court erred in permitting the prosecuting attorney to undertake impeachment of the complaining witness.

■ The rule is well established in this state that before one is entitled to impeach one's own witness, by showing prior inconsistent statements, two prerequisites must be met. First, there must be genuine surprise, and second, the testimony of the witness must be prejudicial and harmful. *State v. Thorne,* 43 Wn. (2d) 47, 260 P. (2d) 331.

Assuming surprise in the instant case beyond that which might normally be expected in the presentation and ex-

amination of any witness in the course of trial, and presuming, without deciding that one is entitled to claim surprise at the results of a searching cross-examination,[1] we are unable to conclude that the cumulative effect of San Pierre's testimony was prejudicial and harmful to the state.

The rule in this latter respect is that for the testimony of one's witness to be harmful to the point of permitting impeachment thereof, the effect of the testimony must be affirmatively prejudicial. That is, the testimony must effectively negate the fact which the party is attempting to prove by the witness. The fact that a witness does not testify as strongly or as favorably as expected is not sufficient to permit impeachment by the party who called the witness. *Cole v. McGhie,* 59 Wn. (2d) 436, 361 P. (2d) 938; *State v. Swan,* 25 Wn. (2d) 319, 171 P. (2d) 222; *State v. Bogart,* 21 Wn. (2d) 765, 153 P. (2d) 507; *State v. Fry,* 169 Wash. 313, 13 P. (2d) 491; *State v. Delaney,* 161 Wash. 614, 297 Pac. 208; *State v. Bossio,* 136 Wash. 232, 239 Pac. 553; *Ferris v. Todd,* 124 Wash. 643, 215 Pac. 54; *State v. Kellogg,* 91 Wash. 665, 158 Pac. 344; *State v. Catsampas,* 62 Wash. 70, 112 Pac. 1116; *State v. Simmons,* 52 Wash. 132, 100 Pac. 269.

In the instant case, San Pierre did not testify that the defendant did not strike or rob him. The net effect of his testimony was a disclaimer of knowledge, under the circumstances surrounding the incident, of whether the defendant in fact did or did not actively participate in the robbery and beating. The situation was thus one of a mere failure on his part to give beneficial testimony, or to state the case as strongly as counsel for the state claimed he had stated it to him or to the sheriff's office. See *State v. Swan, supra.* The cumulative effect of his testimony was not sufficient to support impeachment by the state.

And, the impeachment must be considered prejudicial, for by it the state was permitted to get before the jury the unsworn, out-of-court statements of an impeached witness—statements more favorable to the state than the

---

[1]See *Wright v. Rickman,* 197 Pa. Super. 603, 179 A. (2d) 677.

witness was willing to make from the witness stand. No cautionary or limiting instruction was given to the jury to guide it in its interpretation of this testimony. Thus, the jury could well have substituted San Pierre's out-of-court statements for his in-court testimony. The defendant is entitled to a new trial.

By his second contention, defendant asserts the trial court erred in submitting to the jury the charge of robbery and the lesser included offense of attempted robbery. This is essentially a challenge to the sufficiency of the evidence.

In *State v. Siemion*, 54 Wn. (2d) 17, 18, 337 P. (2d) 715, we stated:

"By a challenge to the sufficiency of the evidence, respondent [defendant] admits its truth, and all inferences that reasonably can be drawn from it. He also requires us to interpret the evidence in the light most prejudicial to him and most favorable to the state. *State v. Coy,* 40 Wn. (2d) 112, 114, 241 P. (2d) 205 (1952)."

We have carefully reviewed the evidence presented in the light of the foregoing rule. Without detailing the evidence beyond the general statement heretofore given, we are satisfied the trial court did not err in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict as to the robbery and attempted robbery charges.

For the reasons heretofore given, the judgment and conviction as to each count is reversed and a new trial granted.

OTT, C. J., DONWORTH, FINLEY, and WEAVER, JJ., concur.