IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81094-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RENE PHILLIP DALLAS, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Rene P. Dallas seeks reversal of his convictions for child molestation in the first degree and rape of a child in the first degree. He argues that the trial court erred in allowing testimony about an uncharged act as evidence of a lustful disposition, and he contends that the evidence presented at trial was insufficient to prove the charges beyond a reasonable doubt. Because the trial court did not abuse its discretion in admitting evidence of the prior act and the State produced sufficient evidence to support each conviction, we affirm.

FACTS

A.L.M. was born in April 1996 and has lived in Whatcom County all her life. A.L.M.'s mother, Monique Lacasse, began dating Dallas when A.L.M. was about a year old. Dallas and Lacasse had two children together, N.D. and A.D. In 2003, when A.L.M. was in second grade and Lacasse was pregnant with A.D., A.L.M., Lacasse, N.D., and Dallas moved into a house in Custer, Washington. A.L.M. had

her own room in the three-bedroom house. Although Dallas and Lacasse shared a room, Dallas slept on the living room couch most nights. N.D. and A.D. also shared a room, but they often slept with Lacasse. A.L.M. typically spent weekends at her grandmother's house or friends' houses. Lacasse and Dallas broke up in January 2008, and he moved out of the Custer house.

Ten years later, in January 2018, A.L.M. reported that Dallas had sexually abused her when she was 11 years old. Dallas was arrested and charged with child molestation in the first degree and four counts of rape of a child in the first degree for events alleged to have occurred on or about January 6, 2007 through January 9, 2008.

Before trial, Dallas moved in limine to exclude testimony regarding an alleged uncharged incident in which Lacasse saw him looking in the window of A.L.M.'s bedroom while she was getting dressed. He argued that testimony about the incident was not admissible under ER 404(b) and, even if admissible, that it should be excluded because it was more prejudicial than probative. The State argued that the testimony would be admissible as evidence of a lustful disposition. The court heard oral argument on the motion but reserved ruling until it could hear an offer of proof from the witness.

The next day, the court heard further argument from the parties on the case law regarding evidence of a lustful disposition. Defense counsel argued that the evidence was potentially relevant only to the child molestation charge and that it was far more prejudicial than probative. The court again reserved ruling, stating that it wanted to hear from the witness outside the jury's presence before deciding

the issue. Defense counsel expressed confusion as to why the court needed to hear the testimony "because we generally agree as to what the facts of that allegation would be." The court stated,

> You may agree to what those facts are but they are not in front of [the] court yet. It has to be presented to me. If you guys want to sign a stipulation as to facts and present that to me, now I may have some basis for making that decision. . . . [U]nder the circumstances, I have to hear what she ha[s] to say. I have to know that to know whether or not there is really a grounds for it being included as part of the evidence that the jury will hear, so I need to hear from the witness.

The court heard an offer of proof from Lacasse before she testified in front of the jury. She stated that she kicked Dallas out of the house in January 2008 and described the circumstances that led to him moving out. One evening, A.L.M. was bathing after a nighttime soccer game. Lacasse saw A.L.M. walk from the bathroom to her bedroom wearing only a towel. Soon after, Dallas went to the garage, and Lacasse assumed he was going to smoke a cigarette. But she noticed that he put his shoes on, which he did not usually do when he went into the garage. Lacasse "got a really sick feeling" and looked out the front door, triggering the motion-sensor light. She saw Dallas standing on a white plastic chair, looking into A.L.M.'s bedroom window. Lacasse "freaked out" and knocked on A.L.M.'s door to ask if she was getting dressed. A.L.M. confirmed that she was, and Lacasse "started going crazy." She loaded the children into the van, but Dallas blocked the exit with his car. Lacasse ran over Christmas decorations in the yard and drove to a gas station. She did not report the incident to law enforcement, but stated, "I parked in a handicapped spot because I hoped that a sheriff would pull up and talk to me."

After Lacasse testified, the court allowed further argument on the issue. Defense counsel argued that the testimony was "far more prejudicial than it is probative" and that there was nothing to indicate that the act was of a sexual nature. The State argued that the evidence demonstrated a sexual proclivity toward A.L.M. because Dallas "was looking in the window of an under-aged female that was in the midst of changing her clothes, so, to say there was nothing sexual about that is a pretty gross mischaracterization." The State acknowledged that the evidence was prejudicial, as the State's evidence in a criminal case tends to be, but argued that it was not overly prejudicial and the probative value of the evidence was not outweighed by that prejudice.

The court ruled that Lacasse's testimony was admissible as evidence of collateral sexual misconduct. The court then considered the prejudicial impact of the evidence:

> Is it prejudicial? It's as prejudicial as probative evidence might otherwise be and I think that the term, the language of art that's often used is that probative evidence is, in fact, prejudicial if it tends to prove a thing to be true. I think the question that comes in is something that can be resolved by cross-examination. How does she know what he was observing? She can see where he was standing, she could see where he was looking, so, you know, she drew some inferences for that, and I think that's something that can [be] sorted out in cross-examination[.] . . . It's not being presented in order to say his behavior was in conformity because he was looking in the window. It's to say that there is a lustful disposition and I think it comes down to cross-examination and who those jurors believe when testimony is presented to them, whether they believe Ms. Lacasse or not.

The court denied Dallas' motion to exclude Lacasse's testimony about the uncharged incident.

At trial, A.L.M. testified that Dallas began sexually abusing her the summer after she finished fifth grade, when she was about 11 years old. The first incident occurred in late June 2007. A.L.M. awoke in the middle of the night to find Dallas sitting on the side of her bed and touching her vulva.[1] Her pajama pants were pulled down to her knees. Although her room was dark, the bedroom door was not fully closed, and she remembered seeing the outline of Dallas' goatee and glasses in the light from the hallway. She also smelled cigarette smoke. Dallas was a heavy smoker. A.L.M. testified that the touching lasted less than a minute after she woke up because she pulled back and Dallas left right away when he realized she was awake. The following morning, A.L.M. tried to act like nothing had happened. She did not tell anyone about the incident because she was scared. The next week, A.L.M. again woke up in the night to find that her pajama pants and underwear were pulled down and Dallas was rubbing her vulva. Like the previous incident, Dallas left when he realized A.L.M. was awake.

The third incident took place a few days before the Fourth of July 2007. A.L.M. woke up in pain because Dallas was digitally penetrating her vagina. Her pajama pants and underwear were pulled down, and Dallas was leaning over her, closer than he had been the previous times. A.L.M. jerked away, and Dallas looked flustered and left. The fourth instance occurred before A.D's birthday in mid-July. A.L.M. awoke with her pajamas, underwear, and blankets pulled down. Dallas was leaning over her and digitally penetrating her vagina. He stopped when she moved away. The fifth occasion that A.L.M. remembered happened before Christmas in

---

[1] Although A.L.M. described the area in her testimony as the surface of her vagina, it is clear from context that she was referring to her vulva.

the winter of 2007. She again woke up in pain because Dallas was digitally penetrating her vagina. Although A.L.M. felt like she could not talk and could barely move, she moved away from his hand and Dallas stopped.

A.L.M. did not remember any other instances of Dallas touching her inappropriately, but she testified that she woke up two other times with her pants and underwear off. She was able to recognize Dallas each time because she saw the silhouette of his glasses, goatee, and clothes in the light from the hallway and smelled cigarette smoke.

A.L.M. decided to report the abuse to law enforcement in 2018 because she wanted to make sure Dallas would not do this to anyone else. She did not tell anyone about the abuse as it was happening because she was scared that Dallas was going to kill her and her family. Although Dallas never threatened her directly while the abuse was occurring, A.L.M. testified that Dallas and Lacasse's relationship "g[o]t physical" almost every day and that Dallas "beat the crap out of [her] mom in front of [her]." A.L.M. said that he threatened Lacasse with an axe and "would threaten to run [them] off the road." During the summer of 2007, A.L.M. took melatonin supplements at night to help her sleep, explaining, "If I didn't[,] I would get up screaming and crying from my mom and him hurting her."

A.L.M. acknowledged that her mother did not pay much attention to her after her siblings were born. The two tended to argue, and A.L.M. felt that Lacasse did not spend time with her because "[s]he was always sad." A.L.M. initially viewed Dallas as a father figure when she was young, but they did not develop "a normal daughter-dad relationship" and "didn't interact." She stated that he would never

talk to her directly, and she avoided being around him because she was scared of him. Although Dallas still did not interact with A.L.M. after the sexual abuse occurred, he bought her Christmas presents for the first time that year.

Lacasse also testified that Dallas treated A.L.M. differently than the other children. She said that she "never really saw him . . . even acknowledge [A.L.M.'s] existence," that he did not seem to like her, and that he seemed resentful that she was around. Lacasse indicated that, before January 2008, A.L.M. frequently witnessed verbal arguments between Dallas and Lacasse and witnessed physical altercations between them "at least every month."

Lacasse then testified in front of the jury about the incident that led to Dallas moving out of the Custer house in January 2008. She and Dallas were in the living room with N.D. and A.D. while A.L.M. was bathing after a late soccer game. Lacasse saw A.L.M. walking down the hallway to her room wearing only a towel, and then Dallas got up to go smoke. Lacasse noticed that Dallas' shoes were gone, which was unusual because normally he did not wear shoes when he would smoke in the enclosed garage. She opened the front door to look outside, and the motion-sensor light turned on. She saw Dallas standing on a plastic chair and looking into A.L.M.'s bedroom window. He would not have been able to see into the window from ground level. When the light came on, Dallas turned behind him to look at the golf course parking lot, then turned back to face the window. Lacasse started yelling and swearing at Dallas. He stumbled off the chair and said nothing to her. Lacasse walked down the hall to A.L.M.'s room, knocked on the door, and asked if she was getting dressed. A.L.M. said she was, and Lacasse "lost it."

Lacasse testified that she did not report the incident to law enforcement, explaining: "I felt like it would be my word against his and he was so manipulative and I didn't have that energy. I didn't even know if it would be provable. I didn't know what to do." She asked A.L.M. if anything else like that had happened to her, and A.L.M. shook her head. Lacasse maintained contact with Dallas regarding N.D. and A.D. until 2010.

A.L.M. first told Lacasse about the sexual abuse in 2016. During this conversation, A.L.M. was "very hysterical [and] upset." Lacasse did not make a report to law enforcement at the time because A.L.M. did not want her to, but she confronted Dallas. She said she never heard from him again after that. Lacasse eventually went with A.L.M. to speak with law enforcement in 2018.

After A.L.M. testified, the State moved to amend the information to conform to her testimony, charging Dallas with two counts of child molestation in the first degree and three counts of rape of a child in the first degree for events alleged to have occurred on or about January 6, 2007 through January 9, 2008. The jury found Dallas guilty on all counts. He appealed.

ANALYSIS

I.      Evidence of Lustful Disposition

Dallas contends that the trial court erred in admitting Lacasse's testimony that she had seen Dallas looking into A.L.M.'s bedroom window while she was getting dressed. He argues that this ruling denied him a fair trial.

A trial court's interpretation of an evidentiary rule is a question of law that we review de novo. State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

But, so long as the trial court's legal interpretation of an evidentiary rule is correct, the court's admission of evidence is reviewed for abuse of discretion. Id. Even if the reviewing court disagrees with the trial court, we will not reverse a discretionary decision unless it is "'manifestly unreasonable or based on untenable grounds or untenable reasons.'" State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013) (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 46–47, 940 P.2d 1362 (1997)).

"ER 404(b) prohibits a court from admitting '[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith.'" State v. Foxhoven, 161 Wn.2d 168, 174–75, 163 P.3d 786 (2007) (quoting ER 404(b)). The rule does not preclude the admission of evidence of a defendant's acts for other purposes such as proving motive, intent, common scheme or plan, or lack of mistake or accident. ER 404(b). Evidence of other crimes, wrongs, or acts may be admitted for these purposes so long as the trial court (1) finds by a preponderance of the evidence that the misconduct occurred, (2) identifies the purpose for which the evidence is sought to be introduced, (3) determines whether the evidence is relevant to prove an element of the crime charged, and (4) weighs the probative value of the evidence against any prejudicial effect. Foxhoven, 161 Wn.2d at 175.

The party offering ER 404(b) evidence has the burden of proving by a preponderance of the evidence that the misconduct actually occurred. State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995). A reviewing court will uphold a trial court's preponderance determination if it is supported by substantial evidence. State v. Baker, 89 Wn. App. 726, 732, 950 P.2d 486 (1997). The third

and fourth steps of the ER 404(b) analysis ensure that the evidence does not run afoul of ER 402 or ER 403, which prohibit irrelevant evidence and allow a court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012).

The analysis of the admissibility of evidence under ER 404(b) must be conducted on the record. Foxhoven, 161 Wn.2d at 175. This requirement "both facilitates appellate review and ensures that the judge gives thoughtful consideration to the issue." State v. Pirtle, 127 Wn.2d 628, 650–51, 904 P.2d 245 (1995). However, "if the record shows that the trial court adopted one of the parties' express arguments as to the purpose of the evidence and that party's weighing of probative and prejudicial value, then the trial court's failure to conduct its full analysis on the record is not reversible error." State v. Asaeli, 150 Wn. App. 543, 576 n.34, 208 P.3d 1136 (2009) (citing Pirtle, 127 Wn.2d at 650–51).

Evidence of a defendant's prior collateral sexual misconduct is admissible for the purpose of showing the defendant's "lustful disposition" toward a victim. State v. Ray, 116 Wn.2d 531, 547, 806 P.2d 1220 (1991). To admit evidence of lustful disposition in accordance with ER 404(b), the evidence proffered must be directly connected to the alleged victim, establishing not just general proclivity but demonstrating a sexual desire for the specific individual. See id. "'The kind of conduct receivable to prove this desire . . . is whatever would naturally be interpretable as the expression of sexual desire. . . . Sexual intercourse is the typical sort of such conduct, but indecent or otherwise improper familiarities are

- 10 -

equally significant.'" State v. Ferguson, 100 Wn.2d 131, 134, 667 P.2d 68 (1983) (quoting State v. Thorne, 43 Wn.2d 47, 60–61, 260 P.2d 331 (1953)) (emphasis omitted).

The State argues that the trial court went through the appropriate ER 404(b) analysis and reasonably exercised its discretion to admit this evidence. Dallas disagrees, arguing that the trial court did not address all of the necessary factors for admission on the record and focused on the fact that, although the evidence was prejudicial, such prejudice could be resolved by cross-examination.

First, Dallas argues that the court never made a finding that the window-peeping event occurred by a preponderance of the evidence. Dallas is correct that there is not an explicit finding in the oral record. However, it is clear from the court's refusal to decide the motion before hearing testimony from the witness that the court understood that it had to make a factual determination regarding the prior act. Considering all of these factors, it is reasonable to conclude that the court adopted the State's position regarding the first element of the analysis. Substantial evidence supports the implicit finding by a preponderance of the evidence that the misconduct occurred because Lacasse testified about the specifics of the incident.

Dallas also argues that any probative value of this evidence was substantially outweighed by the overwhelming, undue prejudicial effect. The court clearly considered the prejudicial effect of this evidence. However, the court made clear that it believed the prejudicial effect of the evidence could be mitigated using cross-examination. Under these circumstances, the court appears to have adopted the State's argument that the probative value of the evidence was not

- 11 -

outweighed by the danger of unfair prejudice. We cannot say that the court abused its discretion in doing so.

The multiple opportunities for oral argument from the parties and extensive discussion of applicable case law show that the court was clearly mindful of the need to find by a preponderance that the event occurred before proceeding to consideration of prejudice and, ultimately, admissibility. The trial judge took testimony to establish what the testimony would be and then proceeded to the next stage of the inquiry for admission. We can conclude from the record that the preponderance standard was satisfied and that the judge weighed both the probative and prejudicial nature of the testimony. Although we would certainly encourage a trial court to make a more explicit record of its analysis of evidence under ER 404(b), the court's failure to conduct the analysis in full on the record is not fatal in this instance.

II.     Sufficiency of Evidence

Dallas also argues that the State did not present sufficient evidence at trial to prove each of the crimes charged beyond a reasonable doubt. Due process requires the State to prove its case beyond a reasonable doubt. State v. Baeza, 100 Wn.2d 487, 488, 670 P.2d 646 (1983). When reviewing the sufficiency of the evidence presented at trial, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A claim of insufficiency admits the truth of

the State's evidence and all reasonable inferences from the evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

When reviewing the sufficiency of the evidence, we must draw all reasonable inferences from the evidence in favor of the State and interpret them most strongly against the defendant. Id. Under this standard, circumstantial evidence is deemed equally as reliable as direct evidence. State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). "'Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience.'" State v. Jackson, 145 Wn. App. 814, 818, 187 P.3d 321 (2008) (quoting 11 WASHINGTON SUPREME COURT COMMITTEE ON JURY INSTRUCTIONS, WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 5.01, at 124 (2d ed. 1994)). However, the existence of a fact cannot rest on guess, speculation, or conjecture. State v. Colquitt, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). "'Credibility determinations are for the trier of fact' and are not subject to review." Cardenas-Flores, 189 Wn.2d at 266 (quoting State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

The testimony of an alleged sex offense victim need not be corroborated to sustain a conviction. RCW 9A.44.020(1). The Washington Supreme Court has recognized that "[s]uch offenses are rarely if ever committed under circumstances permitting knowledge and observation by persons other than the accused and the complaining witness, and not all such offenses are otherwise capable of corroboration." State v. Galbreath, 69 Wn.2d 664, 670, 419 P.2d 800 (1966).

A. Rape of a Child

At the time of Dallas' trial, a person could be convicted of rape of a child in the first degree "when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." Former RCW 9A.44.073(1) (1988), amended by LAWS OF 2021, ch. 142, § 2. For the purpose of sexual offenses, the term "sexual intercourse" "has its ordinary meaning and occurs upon any penetration, however slight," including "any penetration of the vagina or anus[,] however slight, by an object, when committed on one person by another." RCW 9A.44.010(1).

A.L.M. testified that Dallas had digitally penetrated her vagina on three separate occasions in 2007, when she was 11 years old. Testimony also showed that A.L.M. and Dallas were not married and that Dallas was 16 years older than A.L.M. Sufficient evidence existed for each of the charges of rape of a child in the first degree.

B. Child Molestation

At the time of Dallas' trial, a person could be convicted of child molestation in the first degree "when the person has . . . sexual contact with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim." Former RCW 9A.44.083(1) (1994), amended by LAWS OF 2021, ch. 142, § 5. "Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person done for the purpose

- 14 -

of gratifying sexual desire of either party or a third party." RCW 9A.44.010(2). "Sexual gratification" is not an essential element of the crime but is meant to clarify the definition of the essential element of "sexual contact." State v. Lorenz, 152 Wn.2d 22, 34–35, 93 P.3d 133 (2004). Contact is considered "intimate" within the meaning of the statute if it is of such nature that a person of common intelligence could be fairly expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper. Jackson, 145 Wn. App. at 819. Breasts and genitalia are considered intimate areas. Id.

Again, there was sufficient testimony at trial to establish that A.L.M. was 11 years old in the summer of 2007, that she was not married to Dallas, and that Dallas was at least 36 months older than she was. A.L.M. testified about two specific occasions on which Dallas touched the exterior of her genitalia. This is an intimate area, and a person of common intelligence could be fairly expected to know that the touching was improper under the circumstances. There was sufficient evidence in the record to support each conviction of child molestation in the first degree.

Affirmed.

WE CONCUR:

- 15 -