[No. 32145.    Department One.    August 5, 1953.]

THE STATE OF WASHINGTON, *Respondent,* v. FRED L. THORNE, JR., *Appellant.*[1]

[1]Reported in 260 P. (2d) 331.

*John M. Warnock* and *James Tynan,* for appellant.

*Phillip Sheridan* and *Stuart C. French,* for respondent.

HILL, J.—Defendant, Fred L. Thorne, Jr., is charged with the crime of carnal knowledge of his daughter, a child of the age of eight years.

In *Thorne v. Callahan,* 39 Wn. (2d) 43, 234 P. (2d) 517 (1951), we held that Thorne, who had entered a plea of guilty to that charge, had been denied due process of law in that he had not understandingly waived counsel. Thereafter Thorne was permitted to change his plea to not guilty and to go to trial thereon. From the judgment and sentence entered upon the verdict of guilty, this appeal is taken.

Appellant insists that the *corpus delicti* was not established, and that such testimony as had a bearing on it was received in violation of well established rules of evidence. We therefore begin a quest to see whether we can find competent evidence establishing the *corpus delicti*; it is usually established in cases of this kind by the testimony of the victim, but here direct evidence of the commission of the offense charged is entirely lacking. The child, when called as a witness (at that time ten years of age) and asked, "What did your daddy do to you on the night of June 3, 1950?" replied, "Nothing." Her testimony in no way tended to establish the defendant's guilt and, if believed, must have resulted in his acquittal.

It was obvious that, unless the child could be impeached, the state had no case. The state claimed surprise.

Two prerequisites to impeachment of one's own witness are (1) surprise and (2) prejudicial and harmful testimony. *State v. Bossio,* 136 Wash. 232, 239 Pac. 553 (1925); *State v. Swan,* 25 Wn. (2d) 319, 171 P. (2d) 222 (1946); annotation, 74 A. L. R. 1042, 1064. See, also, 15 Wash. L. Rev. 127 (1940). It is not enough to claim surprise; there must be surprise. *Young v. United States,* 97 F. (2d) 200, 117 A. L. R. 316 (1938).

A deputy prosecuting attorney and the juvenile proba-
tion officer interviewed the child the night before the trial
began. The prosecuting attorney knew that she had been
living with the appellant for some time before the trial.
However, the full extent of the prosecutor's knowledge re-
garding the attitude of his key witness was not disclosed
to the trial judge until after the state had been permitted, in
the guise of impeachment, to open the floodgates of hearsay.
Then, in an effort to get in further impeaching evidence, the
prosecutor made the following offer of proof:

"I'll offer to prove, I think through a hostile witness that
she is shown to be, that on the night of—on last night, this
child, in the presence of Mr. Walsh and Mr. Berry from the
juvenile home, she said that she talked to Mr. Tynan [de-
fense counsel] on several occasions and he said that if she
didn't testify, her daddy would go back to prison; also that
her dad . . . that her dad gave her presents. . . .
That if she didn't give her testimony her daddy would go
back to prison, and also said her dad promised her a bike
and that he has been buying her many presents, and I think
those are things we should elicit from this witness. . . .
She is a hostile, adverse witness and those things are things
that are tempting to a child of her tender years. She made
these statements last night in the presence of two mature
witnesses. . . . Also, she told these gentlemen last
night that Mr. Tynan told her if she didn't testify this way
she would go back to the juvenile home. She told Mr. Walsh
and Mr. Berry that."

■ There is no contention that the child misled or
deceived anyone by her statements the night before the
trial. If she had testified at the trial in any respect con-
trary to her statements of the night before to the represen-
tative of the prosecuting attorney, she would most certainly
have been impeached as she was on every other inconsistent
and contradictory statement she made. Either she told the
deputy prosecuting attorney what her testimony would
be, as the offer of proof indicates, or no inquiry was made at
that interview as to how she was going to testify. That the
prosecution (or any party) would put a ten-year-old child
on the witness stand without discussing with her what her

testimony would be seems most unlikely; but that the prosecution, knowing all the matters contained in the offer of proof which we have quoted, would put such a child on the stand without some assurance as to what her testimony would be is inconceivable. A claim of surprise under such circumstances does not warrant credence. There being no surprise, one of the prerequisites for impeachment was lacking and a new trial must be granted.

■ On being asked whether she had made statements to Snohomish county officers accusing her father of the offense charged and of other sexual offenses, the child freely admitted that she had, but said that those statements were not true and that her mother had told her to make them to the officers. The claimed purpose of eliciting from the witness that she had made prior statements (at least seven of them) inconsistent with and contradictory of her present testimony was, by means of that form of impeachment, to destroy her credibility. The impeachment, even if wholly successful, would have accomplished no more than to have her testimony disregarded by the jury. *State v. Bogart,* 21 Wn. (2d) 765, 153 P. (2d) 507 (1944); *State v. Fliehman,* 35 Wn. (2d) 243, 212 P. (2d) 794 (1949).

At the conclusion of the state's examination and impeachment of the child, the trial court indicated in two statements exactly what had happened:

"I mean, she admits she told these officers all these things, any one of which would ultimately achieve the purpose which you should be trying to prove and that is that this little girl isn't worthy of belief, but, of course, actually what is happening is that you are proving your case by hearsay impeachment evidence. In other words, the jury isn't going to believe what this little girl says but I am afraid what this jury is going to believe is what she told the officers is what actually happened, and, of course, that isn't the purpose for which it is allowed to come in, but I didn't make the rule.

"I appreciate that, but I accept the reasoning in the State vs. Thomas case as sound reasoning. That's why I permitted it, although I'll admit that the effect of such impeaching testimony, I am afraid, is going to be considered by the jury other than in the light for which it is offered, but I can't help that. I wish I could.

"I'll accept an instruction, if somebody wants to prepare one the best you can, to try to elucidate and instruct the jury as to type of weight to be given to that testimony. How much good it will do, I can't say."

(No such instruction was requested or given.)

In *Young v. United States*, 97 F. (2d) 200, 205, 117 A. L. R. 316 (1938), it was said:

"The rule in its original and strict form against impeaching one's own witness is discredited everywhere, and it is generally recognized that impeachment may be resorted to where a witness has surprised the party offering him, by his testimony. The overwhelming weight of authority however, supports the rule that though trial courts should, in the exercise of a sound discretion to prevent injury from the surprise testimony of a hostile or corrupt witness, permit cross examination and impeachment by contradictory statements, it is never permitted to make of the rule an artifice by which inadmissible matter may be gotten to a jury through the device of offering a witness, whose testimony is known to be adverse, in order, under the name of impeachment, to get before the jury for its weighing, favorable ex parte statements the witness has made. To the relaxation of the rule against impeaching one's own witness by introducing his ex parte statement in contradiction of his testimony, it is fundamental, we think, that the party offering the witness be really surprised at his testimony. Further, it is equally fundamental that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, as a basis for a verdict, but only to eliminate from the jury's minds any positive adverse effect which might have been created by the testimony which has surprised the offerer."

Whether the semblance of a fair trial could have been preserved by striking the testimony of the child, including all of the impeachment, is a matter on which we need not speculate.

It is pointed out in *Young v. United States, supra,* that impeaching testimony under such circumstances must be considered in the light of

". . . a careful instruction by the court, that the impeaching evidence is not at all admitted as evidence in the offerer's favor, but for what effect it may have in overcom-

ing the testimony which has surprised the offerer. In short, the impeaching and contradictory statements are 'admitted only to destroy the credit of the witnesses, to annul and not to substitute their testimony.' Id. [*New York Life Ins. Co. v. Bacalis,* 5 Cir., 94 F. (2d) 200.]"

See, also, *Culwell v. United States,* 194 F. (2d) 808 (1952).

In *State v. Fliehman,* 35 Wn. (2d) 243, 212 P. (2d) 794 (1949), we said:

"The magnitude of the error in this case was increased by the absence of limiting instructions on the functions of impeachment. The jury was thus permitted to consider the prior inconsistent written statement as proof of the truth of its contents.

"It is elementary that impeaching evidence should affect only the credibility of the witness. It is incompetent to prove the substantive facts encompassed in such evidence."

While we recognize that such a limiting instruction is not always necessary (*State v. Gilmore,* 42 Wn. (2d) 624, 257 P. (2d) 215 (1953)), it would seem that under the circumstances of the present case such an instruction should have been given. In justice to the trial judge, it is to be noted that, although he invited the submission of such a limiting instruction, none was proposed. No error is predicated upon the failure to give such an instruction, and we advert to it for whatever value our views may have in the event of a retrial.

It must be remembered, however, that we started out in quest of competent evidence of the *corpus delicti,* and that the matter of surprise and impeachment just discussed was but an extended detour. The search must continue, for unless it (competent evidence of the *corpus delicti*) can be found, the charge against the appellant must be dismissed. From what has been said, it is clear that it was in no way established by the testimony of the supposed victim or by her impeachment.

The only proof of the *corpus delicti* is (a) the appellant's declarations from which it could be inferred that he was guilty of some sexual misconduct with his daughter on June 3, 1950, and (b) the testimony of the doctor who examined

the child that evening that there had been some penetration and it could have been by a male genital organ.

■■ We have recognized that the *corpus delicti* may be proved by circumstantial evidence. *State v. Gates*, 28 Wash. 689, 69 Pac. 385 (1902). Direct or circumstantial evidence may be used to prove that penetration has taken place. *State v. Gay*, 82 Wash. 423, 144 Pac. 711 (1914). The following from *State v. Biggs*, 57 Wash. 514, 107 Pac. 374 (1910), is particularly apropos here:

"It is contended that the evidence is insufficient because there is no direct evidence of the overt act. But this was not necessary. The crime of rape, like other crimes, may be proven by circumstantial evidence. If this were not so there never could be a conviction for the crime where the victim of the crime refused to testify, or became incapacitated from so doing between the time of the commission of the offense and the time of the trial of the accused."

Appellant is insistent that the testimony in support of "(a)" was received in violation of well recognized evidentiary privileges, and that the final and satisfactory (to the state) testimony of the doctor, "(b)," was obtained by a violation of rudimentary rules of evidence.

At the beginning of the trial and in the absence of the jury, the appellant moved that his wife be excluded from testifying, and pointed out that he was making his request at that time so that he would not have to make an objection in the presence of the jury. The trial court ruled that his wife would be excluded and that he would not have to make his objection in the presence of the jury.

RCW 5.60.060 [*cf.* Rem. Rev. Stat., § 1214] reads in part:

"The following persons shall not be examined as witnesses:

"(1) A husband shall not be examined for or against his wife without the consent of the wife, nor *a wife for or against her husband without the consent of the husband*; nor shall either, during marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during marriage. This exception shall not apply to a civil action or proceeding by one against the other, or to a criminal action or proceeding for a crime committed by one against the other; . . ." (Italics ours.)

It must be noted that there are two distinct parts to this section of the statute. The first pertains to the marital privilege; it says, in effect, that no spouse shall be examined as a witness for or against the other spouse without the consent of such other spouse. *State v. Clark,* 26 Wn. (2d) 160, 173 P. (2d) 189 (1946). The second part sets out an entirely separate and distinct privilege relating to confidential communications; it says that neither spouse can ever, without the consent of the other, be examined as to confidential communications made by one to the other during the marriage. There is a substantial difference between these two privileges and the reasons for them which the courts have not always recognized. 8 Wigmore on Evidence (3d ed.) 638, § 2334; 5 Jones on Evidence (2d ed.) 4000, § 2128.

The first of these, the privilege of one spouse against having the other testify, spreads its shelter over an existing marriage. While the privilege covers acts before marriage (*State v. McGinty,* 14 Wn. (2d) 71, 126 P. (2d) 1086 (1942)), it ceases upon divorce or death. The reason usually given for this privilege is that it fosters domestic harmony and prevents discord. 8 Wigmore on Evidence (3d ed.) 221 *et seq.,* §§ 2227, 2228; 5 Jones on Evidence (2d ed.) 4001, § 2128.

The second, the privilege against having the husband or wife testify as to confidential communications between the two, rests upon an entirely different foundation. It endeavors to encourage between husband and wife that free interchange of confidences that is necessary for mutual understanding and trust. It is thought that the greatest benefits will flow from the relationship only if the spouse who confides in the other can do so without the fear that at some later time what has been said will rise up to haunt the speaker. As Jones puts it, the purpose is

". . . to keep inviolate those acts and confidences without which no two persons would wish to live in intimate and constant relation as man and wife." 5 Jones on Evidence (2d ed.) 4001, § 2128.

In many cases, analogous factors may be seen between this privilege against the disclosure of confidential communica-

tions between husband and wife and those privileges surrounding the confidential communications between attorney-client, priest-penitent, and physician-patient. The privilege against divulgence of confidential communications survives death or divorce. It applies to all actually successful confidential communications made between the spouses while they are husband and wife.

If the communication is heard by a third party, even if by eavesdropping, the third party may testify to it, since the privilege protects only successful confidences. *State v. Slater*, 36 Wn. (2d) 357, 218 P. (2d) 329 (1950); *Wolfle v. United States*, 291 U. S. 7, 78 L. Ed. 617, 54 S. Ct. 279 (1934); 58 Am. Jur. 224, Witnesses, § 383.

One of the arresting officers testified that, in the appellant's presence, after his arrest and before he had been advised of the charge against him, his wife said: " 'Why did you do it?' "; " 'Fred, how could you do it?' "; and

*" 'I can't see how you could stoop so low as to molest your own daughter when there are so many women in the city that could satisfy you if your wife can't' "* (Italics ours);

to which he responded, " 'I was drunk' "; " 'I didn't know what I was doing.' " And another officer testified that the day after appellant's arrest, his wife said in his presence that she wouldn't have believed it if she hadn't seen it with her own eyes, and his response was, " 'Mary, I don't know—I was drunk.' "

It is appellant's contention that, in admitting the testimony as to the wife's accusatory statements, his privilege not to have her testify was nullified. He relies upon *State v. Clark*, 26 Wn. (2d) 160, 168, 173 P. (2d) 189 (1946), where we said:

"The statute [RCW 5.60.060] means just what it says. No spouse shall be examined as a witness for or against the other spouse without the consent of such spouse. [Citations.]

"We do not believe that it is proper to permit a third person to relate a statement made by one spouse against the other which that spouse would not be allowed to relate if called as a witness. Testimony should not be permitted to

enter through the back door which the statute forbids to enter through the front door. *State v. Winnett,* 48 Wash. 93, 92 Pac. 904."

In that case, we were considering the admissibility against the husband of a statement made by the wife to a third party. The statement quoted was proper under the facts, but it has no relation to a situation such as the present, where third parties heard a conversation between the husband and wife.

In the case of *State v. Slater, supra,* a conversation between a man and a woman was overheard by a policeman in an adjoining hotel room. At the time of the trial, the parties were married. It was said:

"While it may be conceded that the wording of our statute (Rem. Rev. Stat., § 1214, subd. 1 [RCW 5.60.060]) prevents either the husband or the wife from testifying against the other concerning a conversation which occurred even prior to their marriage, without the consent of the other, it was not a privileged communication when the officer heard it and made the recording.

"Nor can we agree with appellant's contention that this is in effect permitting the wife to testify against her husband without his consent. It comes clearly within the rules relative to conversations which have been overheard by a third party."

The conversation between husband and wife, having been overheard, was not a confidential communication; and to hold that it cannot be testified to by the person who heard it, if otherwise admissible, would be to add a restriction to the statute relative to marital privilege. We again hold, as in the *Slater* case, *supra,* that testimony by third parties who have overheard a conversation between husband and wife is not barred either as a confidential communication or by the marital privilege.

Appellant urges further that the statements he made actually admitted nothing; that they amounted to no more than silence in the face of accusatory statements after arrest; and that receiving them in evidence was a violation of the rule that one under arrest is not required to reply to accusations.

We have already set forth the appellant's responses to his wife's accusatory questions and statements. The arresting officers also testified that on the way to jail the appellant repeated several times, " 'Why did I do it? Why did I do it?' " and made such statements as: " ' If I hadn't of been drunk I never would have done it' "; " 'I didn't know what I was doing. If I had of, I never would have done it' "; and " 'I'll more than likely get twenty years out of this.' "

After his arrival at the jail, he was informed of the charge against him and he said, " 'I don't know how I could have done it.' " One of the officers testified:

"Well, we asked him about the act the night before and he said he didn't remember; that if his wife said so, she had never lied to him before; it must be true."

In *State v. Redwine,* 23 Wn. (2d) 467, 470, 161 P. (2d) 205 (1945), we approved the rule laid down in *State v. McKenzie,* 184 Wash. 32, 49 P. (2d) 1115 (1935), that

" . . . arrest is sufficient to render inadmissible the fact of the accused's failure to deny accusatory statements made in his presence and hearing."

We are aware of the wide divergence of judicial opinion as to the effect on admissibility of incriminating or accusatory statements made in the presence of the accused and not denied by him, of the fact that he was under arrest or in custody under a criminal charge at the time the accusation was made. See annotations, 80 A. L. R. 1259 *et seq.* (1932), and 115 A. L. R. 1517 *et seq.* (1938). The reasons for our adherence to the rule of inadmissibility in such a situation are adequately set forth in the *McKenzie* and *Redwine* cases, *supra,* and will not be restated here.

However, appellant did not remain silent. In *State v. McKenzie, supra,* we used the following quotation from *Commonwealth v. Madeiros,* 255 Mass. 304, 151 N. E. 297, 47 A. L. R. 962 (1926):

" 'When a defendant while under arrest is charged with a crime by an accusation made in his presence, and makes an equivocal reply or one susceptible of being interpreted as an admission or one not likely to be made by an innocent man,

the question or statement and the answer or comment are admissible.' "

Appellant's statements were susceptible of being interpreted as an awareness of some misconduct and were certainly not the statements of a man conscious of his own innocence. We are not persuaded that appellant's statements were tantamount to silence, and so hold that the trial court did not err in admitting the evidence as to appellant's statements after his arrest.

The other evidence on which the state relies to prove the *corpus delicti* is the testimony of the doctor who examined the appellant's daughter on the night of his arrest. Here again the state had witness trouble. The doctor testified that he had made an examination to determine whether penetration had been made. In response to the question, "And what did you find?" came the answer, "That's questionable, whether there was penetration or not." Led a second time to a consideration of the essential question, the doctor testified that there were some bruises on the child's external genitalia and then said: "I found some penetration had taken place. Whether it was genital penetration or not, I am not in a position to say." The third time around, the doctor testified that there could have been a genital penetration.

■ It is well settled that any degree of sexual penetration, however slight, is sufficient to establish carnal knowledge. RCW 9.79.030 [cf. Rem. Rev. Stat., § 2437]; *State v. Snyder*, 199 Wash. 298, 91 P. (2d) 570 (1939). Here it was testified that there may have been genital penetration. It is to be hoped that in the event of a retrial the doctor's testimony may be procured with less circumlocution and fewer leading and suggestive questions.

■ The testimony relative to the wife's accusatory statements and the appellant's responses thereto, and his statements on the way to jail, while not an admission of carnal knowledge, which involves an act of sexual intercourse, indicate sexual misconduct of some kind involving his daughter on the day of his arrest. His statement that he

might get "twenty years out of this" also shows a realization that whatever he had done was no trivial matter. Considered in connection with the testimony of the doctor who examined the child that same night, those statements sufficiently establish the *corpus delicti.*

Appellant further claims that it was error to admit state's exhibit "A" into evidence. This exhibit was a written statement by the appellant that he had, in November, 1949, acted in a lewd and lascivious manner with his daughter. The statement did not suggest that any penetration had taken place at that time, but only that there had been contact between the sex organs of the accused and his daughter.

■ It is axiomatic that an accused must be tried for the offense charged in an information, and the introduction of evidence of unrelated crimes can be grossly and highly prejudicial. *State v. Goebel,* 36 Wn. (2d) 367, 218 P. (2d) 300 (1950). However, in the trial of cases involving carnal intercourse between the sexes it is permissible to show prior acts of sexual misconduct with the offended female even though such prior act is in itself a crime. *State v. Jordan,* 6 Wn. (2d) 719, 108 P. (2d) 657 (1940) and cases there cited. See, also, *State v. Collier,* 23 Wn. (2d) 678, 162 P. (2d) 267 (1945); and 2 Wigmore on Evidence (3d ed.) 355 *et seq.,* §§ 398, 399, and the annotation on "Admissibility, in prosecution for sexual offense, of evidence of other similar offenses," 167 A. L. R. 565 (1947). Such evidence is admitted for the purpose of showing the lustful inclination of the defendant toward the offended female, which in turn makes it more probable that the defendant committed the offense charged.

■ Nor does the fact that the confession relates to a sexual offense of a character different from that charged make it less admissible. The important thing is whether it can be said that it evidences a sexual desire for the particular female. 2 Wigmore on Evidence (3d ed.) 367, § 399, says:

"The *kind of conduct* receivable to prove this desire at such prior or subsequent time is *whatever would naturally be interpretable* as the expression of sexual desire.

"Sexual intercourse is the typical sort of such conduct,

but indecent or otherwise *improper familiarities* are equally significant."

The situation in *State v. Clough,* 33 Del. 140, 132 Atl. 219 (1925), was strikingly similar to that of the present case. The offense charged was taking and using a ten-year-old child for the purpose of sexual intercourse. The defendant's conduct on the prior occasion as to which evidence was offered was identical to that confessed by the appellant in this case. The court said:

"Just as testimony of other acts is admissible under certain circumstances to show the intent with which the act is committed and so becomes an exception to the general rule of evidence, so, too, in charges of sexual offenses involving carnal intercourse of the sexes an exception to the general rule is made, and evidence of other acts is permitted.

"This exception to the general rule is founded not so much upon the desire to show the intent with which the offense alleged in the indictment was committed, but upon a broader ground of showing sexual inclination or lustful disposition of the defendant toward the prosecuting witness and making it more probable that the offense charged was committed. The distinction is partly based upon the fact that in showing the lustful desire or disposition of the defendant for the prosecuting witness you are showing a motive, i.e., a state of feeling impelling toward the act charged while intent is a mental state accompanying an act.

"I can see no reason for refusing to admit the testimony of the prior lascivious acts of the defendant toward the child in the present case in order to show the lustful desire, if such there was, of the defendant for the prosecuting witness, and of making it more probable that the offense alleged in the indictment was, in fact, committed. 1 *Wigmore* (2d ed.) § 399."

There is no merit in appellant's argument that the conduct described in exhibit "A" was too remote in time (seven months) to be admissible. Wigmore says:

"The *limits of time* over which the evidence may range must depend largely on the circumstances of each case, and should be left to the discretion of the trial Court." 2 Wigmore on Evidence (3d ed.) 367, § 399.

See, also, *State v. Morgan,* 146 Wash. 109, 261 Pac. 777 (1927).

■ We are of the opinion that exhibit "A" was properly admitted.

■ It is strenuously urged that the state has not sustained the burden of proving the appellant's guilt beyond a reasonable doubt. We are of the opinion that there was sufficient evidence to take the case to the jury, *i.e.*, that there was credible and substantial evidence from which a jury would be justified in concluding that the appellant was guilty of the offense charged. It is for the jury to determine the quality or degree of the persuasiveness of that evidence (9 Wigmore on Evidence (3d ed.) 316, § 2497) under proper instruction.

Appellant has failed in his attempt to show that the charge against him should be dismissed.

For the reasons heretofore indicated, we direct that the judgment of conviction be set aside and that appellant be granted a new trial.

GRADY, C. J., MALLERY, WEAVER, and OLSON, JJ., concur.

---

September 17, 1953. Petition for rehearing denied.