# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                  Respondent,<br><br>          v.<br><br>JOHNNY ORIN ROACH,<br><br>                  Appellant. | No. 82053-2-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

APPELWICK, J. — Roach appeals his conviction for rape of a child in the second degree. He argues that the trial court improperly dismissed a potential juror for actual bias. He also argues the trial court erred in declining to allow him to withdraw his consent for his wife to testify against him. He argues he received ineffective assistance of counsel because his counsel did not request an exceptional sentence based on his youthfulness. Last, he argues that the trial court erred in assessing a DNA collection fee upon him because he has a prior felony conviction. We affirm.

## FACTS

Johnny Roach raped a twelve year old girl while his wife Seirah Daniels held her down. The victim was Daniels's close family friend. The State charged the pair as codefendants with rape of a child in the second degree. The two cases were later severed to be tried separately.

Citations and pin cites are based on the Westlaw online version of the cited material.

During voir dire, the State questioned potential jurors on their willingness to convict a defendant for sexual assault based solely on the testimony of an underage victim. The State and potential juror number two had the following exchange:

> PROSPECTIVE JUROR NO. 2: I have a question.
>
> MR. HALSTEAD: Yeah. Number 2, go ahead.
>
> PROSPECTIVE JUROR NO. 2: Back to that.
>
> MR. HALSTEAD: Yeah.
>
> PROSPECTIVE JUROR NO. 2: Let's just say the person that is charging the gentleman is 14 years old, and the only thing that you can look at is her testimony?
>
> MR. HALSTEAD: No, I'm not -- well, the question I posed is what if -- and that's why I kind of predicated it with these sexual assaults normally only happen with two people, right?
>
> PROSPECTIVE JUROR NO. 2: Yeah.
>
> MR. HALSTEAD: There [are] always other individuals around, right, that eventually hear it and then it gets reported. But that's the only real evidence, though, because they are the only two in the room, right?
>
> PROSPECTIVE JUROR NO. 2: Right.
>
> MR. HALSTEAD: So what do you do?
>
> PROSPECTIVE JUROR NO. 2: I couldn't convict.
>
> MR. HALSTEAD: You could not?
>
> PROSPECTIVE JUROR NO. 2: No, not with just one person's word . . . [i]f it was a young child, a young girl.
>
> MR. HALSTEAD: Okay. . . . This is extremely important. So if you had your house burglarized and you -- and you -- let me start over. You go home. You drive up into your driveway. You pull up into your front yard. You walk up to your front door, and a man you don't know is walking out of your house with all of your jewelry in his

2

hands. You look right at him. You see him. You know who he is. He walks right by you. You try to stop him. He walks right by you. You call the police. You are the only person that saw him commit a burglary of your house. How would you feel if we charged him with the burglary and you got on the stand and you identify the person, you told them, "I know he took all my stuff. He took all my jewelry, and I know him from prior contacts," but yet the jury said, "You are the only person who saw him. Doesn't matter that you knew him. Doesn't matter what you saw. Doesn't matter. We are not going to convict him."

PROSPECTIVE JUROR NO. 2: That's our law.

MR. HALSTEAD: What's that?

PROSPECTIVE JUROR NO. 2: That's our law.

MR. HALSTEAD: That's --

PROSPECTIVE JUROR NO. 2: That's the way the court system works.

MR. HALSTEAD: No, that's not --

PROSPECTIVE JUROR NO. 2: In that case. I would not be happy about it but I -- in all honesty.

MR. HALSTEAD: Okay.

PROSEPCTIVE JUROR 2: If I'm talking -- if I'm listening to a 14-year-old girl, the only witness, and there is no other corroborating evidence of a doctor visit, hospital visit, DNA [(deoxyribonucleic acid)], something that is more evidence, I cannot in all conscience send that gentleman to prison for that one thing.

The State sought to have the potential juror removed. Roach argued the potential juror had not indicated she could not be fair and should not be removed. The trial court excused potential juror two.

Prior to trial, the State sought to introduce hearsay statements from Daniels against Roach. It did so anticipating that Roach would invoke spousal privilege to prevent her from testifying. During discussion on the motion, Roach expressly

3

declined to say whether he would invoke the privilege if the State called Daniels to testify. The trial court ruled to exclude Daniels's statements.

On the second day of trial, the State indicated it was working towards a plea deal with Daniels in order to secure her testimony against Roach. The State sought to have Roach elect whether he would invoke spousal privilege or consent to her testifying. Roach indicated that he consented to Daniels's testimony and would not invoke spousal privilege.

That evening, the State interviewed Daniels. During the interview, she relayed several different versions of the events she was to testify about. The inconsistencies were such that the State believed it might be unethical to call her as a witness. The State communicated to defense counsel that it was "99.9 percent sure [it] wasn't going to call [Daniels]." But, the next morning, the State had decided that it would call Daniels to testify.

In response, Roach indicated he was reasserting spousal privilege to block Daniels from testifying. The State argued that Roach could not reassert the privilege because he had waived the privilege and the State had secured a plea deal with Daniels in reliance on Roach's waiver the previous day. The trial court agreed with the State and allowed Daniels to testify.

Daniels initially testified that Roach raped the victim while she forcefully held the victim's arm down. She testified that Roach was on top of the victim when this happened. On cross-examination, she testified that the victim was also on top of Roach for a period of time during the assault. Daniels also confessed to lying during previous interviews. On cross-examination, she testified that Roach never

4

had sex with the victim. She reaffirmed this on redirect, saying that she had made up the entire interaction.

The State also introduced testimony from the victim, who testified that Roach raped her while Daniels held her arms down. The victim's mother also testified. She testified that the victim's sister told her about the assault. She also testified that the victim's demeanor changed in the time after the assault. She said that the victim was withdrawn and would only wear sweatpants and hoodies. She testified that she called the police when she was told what had happened.

The victim's sister also testified. She testified that she found out about the rape when she asked her sister if she was still a virgin in the presence of Daniels. Her sister would not answer and instead put her head down. At this point, Daniels began "giggling" and left the room. The victim's sister followed Daniels, who disclosed to her who the victim had had sex with. She then went outside to talk with her sister, who confirmed the same.

The State also introduced testimony from Lewis County Sheriff's Deputy Emmett Woods. Deputy Woods responded to the initial report. He testified that the victim began crying when he attempted to interview her and would not answer questions. He testified that she also cried prior to a subsequent interview with a female specialist but participated fully in that interview.

Lisa Wahl, the nurse who performed a forensic medical examination on the victim, also testified. Nurse Wahl specializes in examination of minor victims of sexual assault. She testified that the victim told her during her interview that she had been raped. She testified that the victim reported bleeding and difficulty

5

urinating, which are symptoms consistent with rape. She also testified that the victim relayed the conversation between herself, her sister, and Daniels where her sister learned of the rape. She testified that her physical examination of the victim showed trauma to her vagina that was consistent with a rape.

The jury found Roach guilty as charged. At sentencing, the State requested a sentence in the high end of the sentencing range. Roach requested a mid-range sentence. The trial court sentenced Roach at the top of the range, finding that the case "calls out, screams out, for the top of the range. It's senseless. There's no reason for it. There's no excuse for it." Relying on the State's representation that no DNA had previously been collected from Roach, it imposed a DNA fee.

Roach appeals.

DISCUSSION

Roach makes four arguments. First, he argues the trial court erred in dismissing potential juror two for cause. Second, he argues the trial court erred in declining to allow him to revoke his consent for his wife to testify against him. Third, he argues that he received ineffective assistance of counsel at sentencing because his lawyer did not request a mitigated exceptional sentence due to his youth. Last, he argues the trial court erred in assessing a DNA collection fee against him.

I. Dismissed Juror

Roach argues the trial court erred in dismissing potential juror two for cause.

Both the Washington and federal constitutions guarantee a criminal defendant the right to trial by an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art I, § 22; State v. Sassen Van Elsloo, 191 Wn.2d 798, 807, 425 P.3d 807

6

(2018). This right is safeguarded in part by statutes that require the trial judge to dismiss biased jurors. Sassen Van Elsloo , 191 Wn.2d at 807. The operation of these statutes depends on whether the juror is a potential, impaneled, or deliberating juror. Id. The dismissal of a potential juror during voir dire is governed primarily by statue. Id. at 808. RCW 4.44.170 outlines three reasons why a potential juror may be challenged for cause: implied bias, actual bias, and physical inability. The parties agree that the challenge here was for actual bias.

Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). It is not enough that a potential juror has formed or expressed an opinion which forms the basis for an actual bias challenge. RCW 4.44.190. Instead, the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially. Id. Actual bias must be shown by proof. State v. Noltie, 116 Wn.2d 831, 838, 809 P.2d 190 (1991). Equivocal answers do not require a juror to be removed when challenged for cause. Id. at 839. The question is whether a juror with preconceived ideas can set them aside. Id.

The trial court is in an advantageous position to observe credibility in determining actual bias of jurors. Sassen Van Elsloo, 191 Wn.2d at 806-07. We review a trial court's decision to discharge a juror for abuse of discretion. Id. at 806. A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. Id. at 807. An abuse of discretion exists where the

trial court applies the incorrect legal standard or if its decision is based on facts unsupported by the record. Id.

Here, the prospective juror indicated they would be unable to convict in a sexual assault case based solely on the testimony of an underage victim. The juror made clear that their opinion would not change based on the content of the testimony or how well the victim knew her assailant. In the face of a hypothetical by the State comparing similar facts to a residential burglary, the potential juror maintained her position. The answers were unequivocal. And, the testimony evidenced a preconceived idea that the testimony of a young girl is insufficient proof beyond a reasonable doubt which prejudiced the substantial rights of the State to have such evidence weighed impartially. It was not manifestly unreasonable for the trial court to conclude the juror was biased based on that testimony.

Roach argues that a potential juror's answer that they could not convict does not constitute manifest unfitness in light of the State's burden to prove guilt beyond a reasonable doubt. He further argues that the trial court must err on the side of caution to ensure a juror is not dismissed for "her views of the evidence." But, prospective juror two was not dismissed for her views of the evidence in this case. Indeed, she had not yet been presented with any evidence. The juror was dismissed because she had a preconceived view that the testimony of an underage sexual assault victim would be insufficient to support guilt beyond a reasonable doubt, regardless of the content of the testimony or the victim's perceived credibility. The trial court correctly concluded that the juror had an

8

insurmountable bias against such evidence before being shown the specific evidence in this case. This was not an abuse of discretion.[1]

II. Spousal Privilege

Roach argues that the trial court erred in not allowing him to reassert spousal privilege to prevent his wife from testifying after he previously waived the privilege.

Spousal privilege is a statutory evidentiary privilege conferred by RCW 5.60.060.[2] The statute confers two distinct privileges: a confidential communications privilege and a testimonial privilege. See State v. Thorne, 43 Wn.2d 47, 55, 260 P.2d 331 (1953). The spousal confidential communications privilege protects confidential communications between spouses. Id. It says that neither spouse may ever, without the consent of the other, be examined as to confidential communications that occurred during the marriage. Id. The spousal testimonial privilege says that no spouse can be called as a witness against the other spouse at all during the term of the marriage without the consent of such

---

[1] Even if the dismissal had been improper, the error would be harmless. A defendant's constitutional right to an impartial jury or a unanimous verdict is not automatically violated when the trial court erroneously dismisses a potential juror. Sassen Van Elsloo, 191 Wn.2d at 86. Instead the defendant must show that the dismissal resulted in an unqualified juror being impaneled. Id. at 817. Roach makes no argument that the jury that convicted him was not impartial. He is unable to show prejudice that would entitle him to a new trial.

[2] This statute applies to spouses and to domestic partners. Since this case involves a married couple, we refer to the privileges under the statute as spousal privileges.

other spouse. See id. We are concerned only with spousal testimonial privilege here.[3]

The issue here is whether and under what circumstances a spouse may revoke consent for their spouse to testify against them. Neither party cites case law addressing the question. So, the issue appears to be one of first impression. Where the trial court bases an otherwise discretionary decision solely on application of a court rule or statute to particular facts, the issue is one of law, which we review de novo. State v. Tatum, 74 Wn. App. 81, 86, 871 P.2d 1123 (1994).

Regarding the spousal testimonial privilege, RCW 5.60.060(1) provides that "a spouse or domestic partner shall not be examined for or against his or her spouse or domestic partner, without the consent of the spouse or domestic partner." A strict reading of the statute supports Roach's contention that he is free to revoke his consent at any time. The privilege is, after all, "'personal to the one asserting it.'" State v. Tanner, 54 Wn.2d 535, 537, 341 P.2d 869 (1959) (quoting State v. McGinty, 14 Wn.2d 71, 78, 126 P.2d 1086 (1942)). Waiver of other

---

[3] The spousal communications privilege would be inapplicable here because the events Daniels was asked to testify to were not confidential. See State v. Snyder, 84 Wash. 485, 486, 147 P. 38 (1915) (spousal communications rule applies to only confidential communications); State v. Wilder, 12 Wn. App. 296, 299, 529 P.2d 1109 (1974) (presence of third parties defeated confidentiality required to invoke spousal communications privilege). Here, in each of the two events the wife was asked to testify to events—the rape and the subsequent revelation to the victim's sister—where third parties were present. Roach nevertheless attempted to argue to the trial court when trying to revoke his waiver that his initial waiver had been for only the confidential communications privilege, but he had never waived his testimonial privilege. After reviewing the record, the trial court rejected that characterization. Roach does not make the same argument on appeal.

privileges personal to the defendant, like the right to remain silent, are revocable by the defendant. <u>See</u> <u>State v. Piatnitsky</u>, 180 Wn.2d 407, 412, 325 P.3d 167 (2014).

But, spousal testimonial privilege is a statutory evidentiary privilege, rather than a constitutional right. <u>See</u> <u>State v. Bouchard</u>, 31 Wn. App. 381, 387, 639 P.2d 761 (1982), <u>abrogated on other grounds by</u> <u>State v. Sutherby</u>, 165 Wn.2d 870, 887-88, 204 P.3d 916 (2009). Such privileges are to be construed narrowly to serve their purposes so as to exclude the least amount of relevant evidence. <u>State v. Burden</u>, 120 Wn.2d 371, 376, 841 P.2d 758 (1992).

Our Supreme Court has criticized spousal testimonial privilege, noting that it has been extensively criticized as "'lacking modern justification.'"[4] <u>Id.</u> at 375 (quoting <u>State v. White</u>, 50 Wn. App. 858, 862, 751 P.2d 1202 (1988)). Washington courts have construed the privilege narrowly. <u>Id.</u> at 376. The privilege does not bar the admission of the witness-spouse's out-of-court statements against the defendant-spouse. <u>Id.</u> at 374. Nor does the privilege bar admission of a spouse's statements being used to justify the issuance of a search warrant of the defendant-spouse's residence. <u>State v. Osbourne</u>, 18 Wn. App. 318, 322, 569 P.2d 1176 (1977).

The United States Supreme Court has also sharply criticized the privilege, deriding its ancient foundations as being rooted in "women [being] regarded as chattel or demeaned by denial of a separate legal entity." <u>Trammel v. U.S.</u>, 445

---

[4] It is for the legislature to determine whether to amend or repeal spousal privilege. We consider the criticism of the privilege only insofar as it is relevant to the purposes served by the privilege.

U.S. 40, 52-53, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980). The Trammel court also noted that "no other testimonial privilege sweeps so broadly" as spousal testimonial privilege. Id. at 51. It noted that that other privileges, such as priest and penitent, attorney and client, and physician and patient, limit protection to private communications, rather than an absolute testimonial bar. Id. It ruled to modify spousal testimonial privilege in federal courts, allowing the witness-spouse rather than the defendant to hold the privilege. Id. at 53.

The general practice is to accord the trial court broad discretion in evidentiary decisions and trial management. Barbee v. Luong Firm, PLLC, 126 Wn. App. 148, 160, 107 P.3d 762 (2005) (trial court may impose a deadline for a spouse to decide whether or not they will call their spouse to testify in the interest of trial management); State v. Finch, 137 Wn.2d 792, 811, 975 P.2d 967 (1999) (admission of evidence reviewed for abuse of discretion). The spousal testimonial privilege is an evidentiary question. Interpreting the statute to narrowly serve its intended purposes involves discretion, whether to allow assertion of the privilege, to determine the scope of a waiver of the privilege, or to determine whether once waived, the privilege may be reasserted. The exercise of discretion allows balancing the purposes of the privilege against the potential for trial gamesmanship, the exclusion of otherwise relevant evidence, and potential damage to the truth-seeking function.

The purpose of the spousal testimonial privilege is to foster domestic harmony and prevent discord. Burden, 120 Wn.2d at 375. The privilege also represents the natural repugnance to having one spouse testify against the other

and prevents the testifying spouse from having to "'choose between perjury, contempt of court, or jeopardizing the marriage.'" Id. (quoting State v. Wood, 52 Wn. App. 159, 163, 758 P.2d 530 (1988)).

The State argued below that Roach should not be allowed to withdraw his waiver because the State relied to its detriment on Roach's waiver in securing a plea deal with Daniels. But, the record does not show the nature or degree of the detriment to the State. The State did not seek to introduce the plea agreement with Daniels into the record. It did not disclose its terms other than to say it was a plea agreement "to testify." The State never indicated to the jury that it would hear Daniels's testimony.[5] The State's detrimental reliance argument is weak and conclusory.

We next consider evidence that allowing Roach to withdraw his waiver would have served the purposes of spousal testimonial privilege. Roach did not assert the privilege pretrial; he had refused to make any election pretrial. See Tanner, 54 Wn.2d at 538 (the "proper time" for a spousal privilege objection is at the outset of trial). Roach made an election and waived the privilege only after the State pressed for an election, on the eve of trial. In light of the waiver, Daniels agreed to testify against Roach in exchange for a plea bargain. See Burden, 120 Wn.2d at 376 (marital harmony rationale not well served where spouse has made statements damaging to another). The next day Roach withdrew his waiver of the privilege. Nothing in the record indicates that there was a change in Roach's and

---

[5] The State told the jury that the evidence would show that Daniels made certain statements to the victim and her sister. But, these statements were properly admitted through the testimony of the victim and her sister.

Daniels's marital harmony from the previous day. Nothing Roach argues suggests that the reason for seeking to revoke his waiver had anything to do with the marital relationship. In fact, Daniels testified that the two were separated, and that she had cheated on Roach.

On this record, it is reasonable to conclude that allowing Roach to revoke his waiver of spousal testimonial privilege would not further the purposes of the privilege. The trial court did not abuse its discretion in rejecting Roach's attempted revocation of the waiver.[6]

### III. Ineffective Assistance

Roach argues that he received ineffective assistance of counsel at sentencing because his attorney did not request an exceptional sentence below the standard range due to his youthfulness. Roach was eighteen years old when he committed the rape and nineteen years old at sentencing.

The right to effective assistance of counsel extends to sentencing. See State v. Calhoun, 163 Wn. App. 153, 168, 257 P.3d 693 (2011) (considering ineffective assistance claims based on counsel's performance at sentencing). To prevail on a claim of ineffective assistance, Roach must show (1) that his counsel's

---

[6] Even if the trial court had erred, any error was harmless. See State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (nonconstitutional evidentiary error is not prejudicial unless within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred). Here, the State had testimony corroborating the event from the victim, her sister, her mother, the medical professional who examined her, and the deputy who did the investigation. Daniels's testimony was weak and inconsistent. She forgot details, changed her story on the stand, admitted to lying during previous interviews, and eventually denied that the rape ever happened twice, both on cross-examination and redirect. There is not a reasonable probability that the exclusion of her testimony would have materially affected the trial.

performance fell below an objective standard of reasonableness, and (2) but for his counsel's deficient performance, there is a reasonable probability that he would have received a different sentence. Id. There is a strong presumption that defense counsel's conduct is not deficient. State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Legitimate tactics and strategy cannot form the basis for an ineffective assistance of counsel claim. State v. Aho, 137 Wn.2d 736, 745-46, 975 P.2d 512 (1999).

Trial courts must consider the mitigating qualities of youth at sentencing and must have discretion to impose a sentence below the standard range. State v. Houston-Sconiers, 188 Wn.2d 1, 21, 391 P.3d 409 (2017). A court is allowed to consider youthfulness as a mitigating factor when sentencing an offender over the age of eighteen. State v. O'Dell, 183 Wn.2d 680, 696, 358 P.3d 359 (2015). Neither of these cases stand for the proposition that a trial court must make findings of fact concerning a defendant's youth or that an attorney must make arguments based upon a defendant's youth whenever a defendant is anywhere close to the age of 18.

The State recommended that Roach be sentenced at the high end of the sentencing range. Roach's attorney responded with a recommendation in the middle of the sentencing range. This was a legitimate tactic to secure a sentence as low as possible. This is especially so because nothing in the presentencing report indicates that Roach's youth mitigated his culpability for the crime. But, the trial court was clearly aware of Roach's age at the time of the offense, because it was included in the presentencing report. Roach does not now point to anything

15

in the record, outside of the fact that he was eighteen years old, that supports a contention that his youth mitigated his culpability for his crimes. Given the nature of the offense, and the lack of evidence of any effect of Roach's youth on the case, counsel was not deficient for declining to argue for a mitigated sentence based on Roach's youth.

Roach did not receive ineffective assistance of counsel.

IV. <u>DNA Collection Fee</u>

Roach last argues that the trial court erred in assessing a DNA fee on him. The imposition of a DNA collection fee is required "unless the State has previously collected the offender's DNA as a result of prior conviction." RCW 43.43.7541. The State is required to collect a DNA sample from every adult or juvenile convicted of a felony. RCW 43.43.754. Roach argues that because he has a previous felony conviction, he should not be assessed the fee.

The State represented to the trial court that Roach's DNA had not previously been collected. But, Roach has a felony conviction from January 2019. The State would have been required by RCW 43.43.754(1) to collect a DNA sample at that time, and Roach would have been assessed a DNA fee. It is a gross misdemeanor for an offender to willfully refuse to comply with a legal request for a DNA sample. RCW 43.43.754(11). The record does not indicate that Roach was ever charged with such a crime. So, an issue of fact remains as to whether Roach was assessed a DNA fee for his previous felony conviction and is now being charged the fee again due to the State's failure to collect a sample. Remand is necessary to

16

determine if Roach has previously been assessed the DNA fee. If so, the fee should be stricken.

We affirm Roach's conviction and sentence. We remand for a determination of whether Roach has previously been assessed a DNA collection fee.

_Appelwick, J._

WE CONCUR:

_____    _Smith, J._

Cᴏʙᴜʀɴ, J. (Concurring)

I concur with the majority opinion. I write separately to urge our legislature to revisit the spousal confidential communications privilege and spousal testimonial privilege provided in RCW 5.60.060(1).[1]

As our United States Supreme Court recognized:

> The ancient foundations for so sweeping a privilege have long since disappeared. Nowhere in the common-law world—indeed in any modern society—is a woman regarded as chattel or demeaned by denial of a separate legal identity and the dignity associated with recognition as a whole human being.

Trammel v. United States, 445 U.S. 40, 52, 100 S. Ct. 906, 913, 63 L. Ed. 2d 186 (1980). The spousal privileges permit the defendant spouse to control the witness spouse long after their relationship has dissolved. The privileges benefit the defendant spouse, at the expense of the witness spouse, both in terms of the witness spouse's free will and ability to negotiate plea deals. They also have the effect of excluding probative evidence that is vital to seeking justice.

The Supreme Court modernized the spousal testimonial privilege 41 years ago in Trammel by holding that "the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." 445 U.S. at 53. A majority of states followed, but ours is not one of them. In fact, today, Washington is one of just four states where the defendant spouse alone holds the privilege.[2]

---

[1] We acknowledge the spousal privileges encompass registered domestic partnerships, and our use of the terms "spousal" and "spouse" encompass registered domestic partnerships and their partners.

[2] Aʀɪᴢ. Rᴇᴠ. Sᴛᴀᴛ. Aɴɴ. § 13-4062; Cᴏʟᴏ. Rᴇᴠ. Sᴛᴀᴛ. § 13-90-107; Mɪɴɴ. Sᴛᴀᴛ. Aɴɴ. § 595.02; see also Alexandra Aparicio, Her Alone: Feminist Perspectives on the

The spousal privileges originated from two medieval canons: "first, the rule that an accused was not permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband was that one." Id. at 44. These canons formed the rule "that what was inadmissible from the lips of the defendant-husband was also inadmissible from his wife." Id.

Under common law, courts considered one spouse incompetent to testify in court against the other in a prosecution. Id. at 43-45. The spousal testimonial privilege is a competency rule "because it operates to entirely preclude a witness's testimony." State v. Thornton, 119 Wn.2d 578, 580, 835 P.2d 216 (1992).

This rule has existed in Washington in some form since before statehood. In 1854, the privilege statute provided:

> Sec. 294. In order to encourage confidence, and to preserve it inviolate, the following persons shall not be examined as witnesses:
>
> 1st. A husband shall not be examined for or against his wife, nor a wife for or against her husband; nor can either, during marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during marriage. But this exception shall not apply to a civil action or proceeding by one against the other; nor to a criminal action or proceeding for a crime committed by one against the other[.]

---

Future of Spousal Privileges, U. CHI. L. REV. ONLINE (July 6, 2020), https://lawreviewblog.uchicago.edu/2020/07/06/spousal-privileges/.
Five states provide that "both spouses hold the adverse testimonial privilege; in these states, if the witness wants to testify against her spouse, the defendant may prevent her from doing so, but if the defendant does not object to the testimony the witness may still refuse." R. Michael Cassidy, Reconsidering Spousal Privileges after Crawford, 33 AM. J. CRIM. L. 339, 364 (2006) (citing KY. R. EVID. 504; MISS. CODE ANN. § 13-1-5; NEB. REV. STAT. § 27-505; W. VA. CODE ANN. § 57-3-3; WYO. STAT. ANN. § 1-12-104).

LAWS OF 1855, ch. 31, § 294. Our legislature codified this rule in RCW 5.60.060(1).[3] A brief look at the gains women have made since the first adoption of the spousal privilege statute sheds light as to whom the legislature originally designed this statute to benefit. Since our legislature enacted the spousal privileges, women have gained the right to keep their wages, own and sell property, vote, sit on juries, and assert a legal action.[4]

As the majority correctly notes, we credit the legislature for designing RCW 5.60.060(1)'s "spousal testimonial privilege . . . to foster domestic harmony and prevent discord." However, "[a]s the policy of considering all of the facts has become central to the concept of justice, the sanctity of the martial relationship has waned." Teresa Virginia Bigelow, Comment, The Marital Privileges in Washington Law: Spouse

---

[3] RCW 5.60.060(1) currently provides, "A spouse or domestic partner shall not be examined for or against his or her spouse or domestic partner, without the consent of the spouse or domestic partner; nor can either during marriage or during the domestic partnership or afterward, be without the consent of the other, examined as to any communication made by one to the other during the marriage or the domestic partnership."

[4] In 1881, Washington's territorial legislature gave married women the right to own, sell, or will property, and to keep their wages. Seattle Women's History Timeline, SEATTLE MUNICIPAL ARCHIVES, http://www.seattle.gov/cityarchives/exhibits-and-education/online-exhibits/women-in-city-government/seattle-womens-history-timeline. In 1883, the legislature gave women the right to vote and to serve on juries. Carolyn McConnell, The road to women's suffrage began in Washington State, CROSSCUT (Mar. 20, 2020), https://crosscut.com/2020/03/road-womens-suffrage-began-washington-state. But, the Washington Supreme Court overturned those rights in Harland v. Territory, 3 Wash. Terr. 131, 152, 13 P. 453 (1887) ("Females, then, are not voters in this territory, and not being voters, they are not competent to sit on juries."). In 1888, our legislature again provided women the right to vote, but withheld the right to sit on a jury. McConnell, supra. But, the court again overturned the right to vote. McConnell, supra. From 1910 to 1974, the Washington constitution provided that only women who could read and write in English, and were not of Native American or Asian, could vote. McConnell, supra. In 1920, Washington ratified the 19th Amendment to the U.S. Constitution. McConnell, supra.

<u>Testimony and Marital Communications</u>, 54 W<small>ASH</small>. L. R<small>EV</small>. 65, 88 (1978) (citing Robert

M. Hutchins & Donald Slesinger, <u>Some Observations on the Law of Evidence: Family</u>

<u>Relations</u>, 13 M<small>INN</small>. L. R<small>EV</small>. 675, 679 (1929)).

 As the <u>Trammel</u> Court explained, the contemporary justification for the

testimonial privilege—to protect marital harmony—is no longer persuasive. 445 U.S. at

52. "When one spouse is willing to testify against the other in a criminal proceeding—

whatever the motivation—their relationship is almost certainly in disrepair; there is

probably little in the way of marital harmony for the privilege to preserve." <u>Id.</u>

Furthermore, the act of the defendant spouse preventing the witness spouse from

testifying "could actually undermine the marital relationship" because the prosecution

might not offer a witness spouse immunity or a deal if the prosecution knows the

defendant spouse will prevent the witness spouse from testifying. <u>Id.</u>

 In sum, the spousal privileges may do more harm than good. The rules hinder

courts' access to relevant evidence. Yet, while hanging on to this archaic practice, time

and again, our legislature has recognized how the privileges has thwarted justice. The

response has been to create one exception after another.

 RCW 5.60.060(1) first provides that the spousal testimonial privilege does "not

apply to a civil action or proceeding by one against the other, nor to a criminal action or

proceeding for a crime committed by one against the other." And, the privilege does not

bar the witness spouse from testifying in a "criminal action or proceeding against a

spouse or domestic partner if the marriage or the domestic partnership occurred

21

subsequent to the filing of formal charges against the defendant."[5]  RCW 5.60.060(1).

Later, in Thornton, our Supreme Court interpreted this exception's plain language to

mean "the rule of spousal incompetency cannot be used to bar testimony of the spouse

against whom any crime was committed."  119 Wn.2d at 583.  The court explained, "It is

hard to conceive of any credible justification for preventing an injured spouse from

testifying in a criminal proceeding against the perpetrator. Certainly, the marital

relationship has already been damaged, and if criminal activity is occurring, no

legitimate purpose is served by refusing the victim of the crime the opportunity to testify

against the person who committed it."  Id. at 581-82.  As we observed in State v.

Shuffelen, this "exception to the spousal incompetency rule rests on whether a

particular offense is 'a crime committed by one spouse against the other.' "  150 Wn.

App. 244, 258, 208 P.3d 1167 (2009).  So, as evident from the instant case, the

defendant spouse may still bar the witness spouse from testifying in civil and criminal

proceedings where the harm is to a third-party and not to the witness spouse.

In 1965, our legislature created the second exception to the spousal privileges to

address concerns about physical and sexual child abuse.  See State v. Thompson, 88

Wn.2d 518, 532, 564 P.2d 315 (1977) (Utter, J., dissenting) (citing LAWS OF 1965,

ch. 13, § 6); State v. Waleczek, 90 Wn.2d 746, 751, 585 P.2d 797 (1978) (citing LAWS

OF 1965, ch. 13, § 1).  Specifically, RCW 5.60.060(1) provides that the privileges do not

apply "to a criminal action or proceeding for a crime committed by said spouse or

---

[5] Our legislature adopted this exception after a case in which a witness married the defendant prior to trial and then the defendant invoked the privilege to bar the witness from testifying.  S.B. 4474, 47th Leg., Reg. Sess. (Wash. 1982); LAWS OF 1982, ch. 56, § 1.

domestic partner against any child of whom said spouse or domestic partner is the parent or guardian." "In light of the legislative intent to punish child abusers and protect children from further mistreatment, Washington courts have liberally interpreted 'guardian' to include a spouse acting in loco parentis, meaning functionally as a parent or guardian, even briefly." State v. Martinez, 2 Wn. App. 2d 55, 73, 408 P.3d 721 (2018) (privilege did not apply and did not bar a spouse from testifying when the defendant acted in loco parentis of the minor-babysitter who the defendant abused). Thus, our courts have broadened this exception to allow guardians other than biological parents to testify and to allow testimony of spouses who are parents of non-minor children. See State v. Lounsbery, 74 Wn.2d 659, 445 P.2d 1017 (1968) (extending exception to stepparents); Waleczek, 90 Wn.2d at 753 (extending exception to temporary-custodial guardians); State v. Bouchard, 31 Wn. App. 381, 387, 639 P.2d 761 (1982) (extending exception to grandparents); State v. Chenoweth, 188 Wn. App. 521, 354 P.3d 13 (2015) (extending exception to spouse of non-minor children).

RCW 5.60.060(1)'s third exception provides that the spousal privileges do not apply to involuntary civil commitment proceedings under RCW 71.05 (mental illness) or 71.09 (sexually violent predators). Our legislature also enacted an exception to the privileges in proceedings for nonsupport and family desertion. RCW 26.20.071.

Despite all these exceptions, the statute continues to allow the defendant spouse to control the witness spouse in all other circumstances. "The public policy of one generation may not, under changed conditions, be the public policy of another." Funk v. United States, 290 U.S. 371, 381, 54 S. Ct. 212, 78 Ed. 369 (1933) (citing Patton v. United States, 281 U.S. 276, 306, 50 S. Ct. 253, 74 L. Ed. 854 (1930)). The Supreme

Court noted that Congress "manifested an affirmative intention not to freeze the law of privilege.  Its purpose rather was to 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis,' and to leave the door open to change." Trammel, 445 U.S. at 47.  Our state, however, chose to codify the spousal privileges, thus, it is for our legislature, not the courts, to revisit and modify the statute accordingly.  I strongly urge it to do so.  Preserving marital or domestic harmony should not be the basis of barring testimony from spouses who have probative evidence and choose to testify.  It is the witness spouse, not the government, who is in the best position to know whether they could or should preserve relations.

_Coburn, J._